**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| In re: | CASE NO.   6:20-bk-02684-LVV |
| **DM World Transportation, LLC** | CHAPTER 11<br>Emergency Hearing Requested on or<br>Before May 14, 2020 |
| Debtor._____/ | |

**EMERGENCY MOTION FOR INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO SELL ACCOUNTS RECEIVABLE UNDER A FACTOR PROGRAM WITH RTS FINANCIAL SERVICE, INC. PURSUANT TO 11 U.S.C. §§ 363(b) AND (f); (II) GRANTING SECURITY INTERESTS PURSUANT TO 11 U.S.C. §§ 364(c), 364(d)(1), 364(e), AND 507; (III) AUTHORIZING USE OF CASH COLLATERAL; AND (IV) SCHEDULING A FINAL HEARING**

**DM World Transportation**, **LLC**, ("DM World", or the "Debtor"), by and through undersigned counsel, files this Emergency Motion for Interim Order (I) Authorizing the Debtor to Sell Accounts Receivable Under a Factor Program With RTS Financial Service, Inc. Pursuant to 11 U.S.C. §§ 363(b) and (f); (II) Granting Security Interests Pursuant to 11 U.S.C. §§ 364(c), 364(d)(1), 364(e), and 507; (III) Authorizing Use of Cash Collateral; and (IV) Scheduling a Final Hearing, (the "Factoring Motion"), for entry of an emergency and/or interim and final order authorizing the Debtor to (I) continue its pre-petition factoring arrangement, (the "Factoring Agreement"), with RTS Financial Services, Inc., ("RTS", or the "Factor"); (II) sell future accounts receivable to RTS pursuant to §§363(b) and (f) of Title 11 of the United States Code (the "Bankruptcy Code") and to grant a first priority security interests to RTS pursuant to § § 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code; and (III) use cash collateral of RTS in connection with the Factoring Arrangement, and in support thereof says:

**Bankruptcy Rule 4001 Summary of Relief Requested**

1.      The Motion seeks authority for the Debtor to sell its post-petition receivables under

1

a factoring arrangement and use the proceeds for operations.

2. The Motion seeks a first priority lien on the Debtor's accounts receivables and other collateral to secure the factor facility.

3. The Motion seeks to award a super-priority claim to the factor on accounts receivables.

## Jurisdiction

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

5. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 105 and 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

## Background

### A.  General Background

8. On May 12, 2020, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No trustee, examiner or official committees have been appointed in this case.

9. DM World is a Florida Limited Liability Company based in Longwood, Florida. DM World is a full truck load carrier operating an over-the-road trucking fleet, (the "OTR Fleet"), with 182 trucks (160 via sublease to an affiliate) and 350 dry van trailers that transport goods across the forty-eight contiguous States. Over ninety percent of the OTR Fleet is "double pup" certified further enhancing the Debtor's ability to transport mass shipments across the country.

Over fifty percent of the OTR Fleet utilizes teams that maximize coordination and cooperation. DM World also provides logistics services arranging dry van, temperature regulated, intermodal (use of two freight modes such as truck and rail), and container shipments.

### B. The Debtor's Relationship with RTS

10. Prior to the Petition Date, RTS and the Debtor entered into the Factoring Agreement, a true and correct copy of which is attached hereto as **Exhibit "A"** and incorporated herein by reference. In order to preserve its ongoing business and going concern, the Debtor requires continuing the Factoring Agreement. RTS has agreed, on an interim basis, to purchase accounts and make post-petition advances against same to the Debtor in pursuant to sections 363(b) and (f), and 364(c), 364(d)(1), 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014. This Motion requests that the Court grant emergency relief and schedule further interim and/or final hearings to consider approval of the Factoring Agreement on a further interim and/or final basis.

11. Pursuant to the Factoring Agreement, RTS agreed to provide accounts receivable financing, on a transaction-by-transaction basis. RTS's decision to purchase an account is at its sole discretion upon reviewing the related documents and assurance there exists no dispute or claim upon the account. Upon the purchase of each account, RTS advances to the Debtor one hundred percent of the Net Amount for each invoice minus its fee of one and fifteen hundredths percent (1.15%). The "Net Amount" is the gross amount of the account less any discount or allowance allowed by the Debtor. RTS advances the payment without requirement of a reserve on the Net Amount.

12. Accounts purchased from the Debtor are with full recourse. If an account is not paid in full, the Debtor is obligated to repurchase the delinquent account at face amount, less any

payments received on the account. Typically, the Factor will require delinquent accounts be re-purchased within ninety (90) days, but such time may be extended at the Factor's discretion. In no case may the repurchase deadline extend beyond one hundred and twenty (120) days.

13. The Debtor has no unencumbered funds or credit available to fund its business operations. Without the funding from RTS under the Factoring Agreement, the Debtor's operations will stop. Therefore, it is imperative that the Debtor be authorized to continue the Factoring Agreement with RTS post-petition in order to preserve the business.

14. To continue its business operation, the Debtor must be able to provide assurance to its clients, personnel, and vendors that it will be able to pay in the ordinary course for all post-petition purposes including wages. Entering into the Factoring Agreement with RTS will provide the Debtor with the cash liquidity necessary to operate its business and to pay the wages, salaries, insurances, and other expenses associated with running the Debtor's business.

15. In order to avoid immediate and irreparable harm to the Debtor pending the final hearing, the Debtor asks the Court to allow it to continue the Factoring Agreement with RTS immediately. Accordingly, the Debtor seeks entry of an order authorizing it to sell its accounts receivable with RTS under the Factoring Agreement.

**Legal Argument and Citation to Legal Authority**

16. The Debtor is unable to obtain financing on more favorable terms from sources other than RTS. The Factor is vital to the Debtors continued post-petition business operations.

17. Pursuant to 11 U.S.C. § 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Court may authorize the obtaining of credit. In the event the Debtor does not obtain post-petition accounts receivable financing, it will not have the available funds with which to continue business operations. Accordingly, the Debtor respectfully submits that obtaining post-

petition financing is necessary in order to avoid immediate and irreparable harm to the Debtor.

18. Section 363(b) of the Bankruptcy Code provides that the Debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b). Section 363(f) of the Bankruptcy Code permits the Debtor to sell property under §363(b) free and clear of liens if, the requirements of section 363(f) are satisfied.

19. Section 364 of the Bankruptcy Code provides in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with a priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate is subject to a lien.

20. To facilitate the post-petition financing, the Debtor prepared a six-week budget, a copy of which is attached as **Exhibit "B"** to the Motion (the "Budget"), setting forth, *inter alia*, the Debtor's projected cash expenditures and receipts on a weekly basis.

21. It is well recognized that the appropriateness of a proposed post-petition financing facility must be considered in light of the current market conditions. See In re Lyondell Chem. Co., No. 09-10023 (Bankr.S.D.N.Y. 2009). Indeed, courts often recognize that where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." See In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr.N.D.Ga. 1988). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Section 364(a) and (b). See In re Plabell Rubber Prods., Inc., 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

22. The Debtor submits that the proposed financing is in the best interest of the estate and its creditors, given the fact that the Debtor does not have the ability to obtain other financing elsewhere. The Debtor submits that the estate could not obtain more favorable financing than that which is proposed in the time frame required to ensure uninterrupted cash flow.

### Use of Cash Collateral

23. The Debtor's use of Cash Collateral is limited to payment of the authorized expenses contained in the Budget. The Debtor will be authorized to use the Cash Collateral only to pay the ordinary and necessary operating expenses of the Debtor listed in the Budget (with a no more than 10% cumulative variance in each line item of the Budget during the interim period covered by this Interim Order) (the "Approved Expenses"). RTS may consent to the Debtor's request(s) for additional expenditures or other changes to the Budget. In such an event, the approved expenses shall be deemed to be included in the Budget and covered by the proposed Interim Order.

24. RTS has reviewed the Budget and has no objection to the same.

25. The Debtor and RTS negotiated the terms and conditions of the agreement in good faith; the terms and conditions of such credit extension are fair and reasonable and are supported by reasonably equivalent value. Any credit extended by RTS pursuant to the terms of this Motion will have been extended in "good faith" (as that term is used in § 364(e) of the Bankruptcy Code).

### Request for Waiver of Stay

26. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this motion. Pursuant to Bankruptcy Rule 6004(h), "an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." As set forth above, the post-petition financing is

essential to prevent considerable damage to the Debtor's operations and the value of its Property. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

27. Upon court approval of this Motion, the Debtor and RTS will execute the post-petition financing and any related documents.

WHEREFORE, Debtor respectfully requests this Court enter an Order granting the following:

A. Authorize the Debtor to obtain such post-petition financing and incur post-petition indebtedness, which financing and indebtedness due and owing by the Debtor to the Factor shall: (i) pursuant to § 364(c)(1) of the Bankruptcy Code, have priority (except as to agreed carve-out for U.S. Trustee fees) over any and all administrative expenses; and (ii) pursuant to § 364(d)(1) of the Bankruptcy Code, be secured by a first priority lien in the Debtor's accounts receivable, contract rights, general intangibles, property and proceeds of any kind, created or arising on or after the Petition Date;

B. Authorize the Debtor to execute a security agreement, loan agreement, and such other documents, instruments, and agreements as are necessary to evidence the obligation to repay the post-petition financing made by the Factor pursuant to this Motion and to grant and perfect liens on the pledged assets and proceeds, and to perform all such other acts as reasonably may be required in connection with the credit to be provided pursuant to this Motion;

C. Grant relief from the automatic stay imposed by § 362 of the Bankruptcy Code to the extent necessary to permit the Factor and the Debtor to implement the terms of this Motion and the underlying Factoring Agreement; and

D.       Grant the Debtor such other and further relief as the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this 13th day of May 2020.

/s/ John B. Dorris
**R. Scott Shuker, Esq.**
Florida Bar No. 984469
rshuker@shukerdorris.com
**Mariane L. Dorris, Esq.**
Florida Bar No. 173665
mdorris@shukerdorris.com
**John B. Dorris, Esq.**
Florida Bar No. 093744
jdorris@shukerdorris.com
**SHUKER & DORRIS, P.A.**
121 S. Orange Ave., Suite 1120
Orlando, Florida 32801
Telephone: 407-337-2060
Facsimile:  407-337-2050
*Attorneys for Debtor*

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**In re:**                                                          CASE NO.   6:20-bk-

**DM World Transportation, LLC**                    CHAPTER 11

        **Debtor.**
_____/

## **CERTIFICATE OF SERVICE**

      **I HEREBY CERTIFY** that a true copy of the forgoing this **Emergency Motion for Interim Order (I) Authorizing the Debtor to Sell Accounts Receivable Under a Factor Program With RTS Financial Service, Inc. Pursuant to 11 U.S.C. §§ 363(b) and (f); (II) Granting Security Interests Pursuant to 11 U.S.C. §§ 364(c), 364(d)(1), 364(e), and 507; (III) Authorizing Use of Cash Collateral; and (IV) Scheduling a Final Hearing** has been furnished either electronically or by U.S. First Class Mail or FedEx Overnight (where indicated), by email (if email address is known) and by fax (if known) to: Debtor Beck Tokhtaev, beck@dmwtrans.com, 450 South Ronald Reagan Boulevard, Longwood, Florida 32750; RTS Financial Service, Inc., Harris J. Koroglu, Esq., HKoroglu@schutts.com; the parties entitled to receive CM/ECF noticing; the secured creditors and the twenty largest unsecured creditors as shown on the matrix attached to the original of this motion filed with the Court; and the U.S. Trustee's Office, 400 W. Washington St., Ste. 1100, Orlando, FL 32801 this <u>13th</u> day of May 2020.

                                                                <u>/s/ John B. Dorris</u>
                                                                **John B. Dorris, Esq.**

| | | |
|---|---|---|
| Jennifer M. Brinkley<br>ADP Augusta<br>One ADP Drive<br>Augusta, GA 30909 | John Abrams<br>Love's Travel Stop<br>2766 US-17 S<br>Brunswick, GA 31523 | Pamela Ashcroft<br>Tucker, Albin & Assoc.<br>1702 N Collins Blvd, Ste 100<br>Richardson, TX 75080 |
| Bank of America Credit<br>P.O. Box 982238<br>El Paso, TX 79998 | Jack West<br>NCS Collection (Bridgestone)<br>PO Box 24101<br>Cleveland, OH 44124 | Verizon Connect<br>1100 Winter Street<br>Suite 4600<br>Waltham, MA 02451 |
| Bank of America Credit<br>P.O. Box 982238<br>El Paso, TX 79998 | Steven Lang<br>Passaic Industrial Property<br>co Law Office of Steven Lang<br>1 Broadway, Ste. 201<br>Denville, NJ 07834 | |
| Paul Bandar<br>Bondar Insurance Group<br>619 Enterprise Dr., Ste. 202<br>Oak Brook, IL 60523 | Sam Tilsley<br>Penske<br>2177 W. Landstreet Road<br>Orlando, FL 32809 | |
| Paul Bandar<br>Bondar Insurance Group<br>619 Enterprise Dr., Ste. 202<br>Oak Brook, IL 60523 | Jeffrey Paschal<br>Premier Trailer<br>5201 Tennyson Parkway<br>Suite 205<br>Plano, TX 75024 | |
| Shannon Myers<br>BowMan Sales & Equipment Inc<br>10233 Governor Lane Blvd<br>Williamsport, MD 21795 | Delores Reyes<br>Procon Fleet - Spireon<br>16802 Aston Street<br>Irvine, CA 92606 | |
| Shannon Myers<br>BowMan Sales & Equipment Inc<br>10233 Governor Lane Blvd<br>Williamsport, MD 21795 | Delores Reyes<br>Spireon<br>16802 Aston Street<br>Irvine, CA 92606 | |
| Cheryl Grelen<br>Comdata<br>5301 Maryland Way<br>Brentwood, TN 37027 | Keith Dixon<br>Star Leasing<br>PO Box 76100<br>Cleveland, OH 44101 | |
| Aaron Aguirre<br>DAT Solution<br>PO Box 783801<br>Philadelphia, PA 19178 | Jorge Rosias<br>TruckNRoll<br>9880 Sidney Hayes Rd<br>Orlando, FL 32824 | |

## Exhibit "A"

## FACTORING AGREEMENT

THIS FACTORING AGREEMENT (the "Agreement") made and entered into this **May 11, 2020** (the "Effective Date") by and between **RTS FINANCIAL SERVICE, INC.**, ("Factor"), a Kansas Corporation; and **DM WORLD TRANSPORTATION LLC, as Debtor-in-Possession** ("Assignor"), a **Limited Liability Company** in the state of **Florida**.

## RECITALS

1. Assignor desires to sell to Factor all of its existing and future Accounts Receivable ("Accounts") arising from services performed in the regular course of Assignor's business.

2. Factor desires to purchase certain of those Accounts, which Factor in its sole discretion deems acceptable for purchase, according to the terms and conditions provided in this Agreement.

3. Assignor is a debtor in Chapter 11 proceedings assigned case number           (the "Case") pending in the United States Bankruptcy Court for the Middle District of Florida (the "Court"). The Case was commenced on           (the "Petition Date"). Since the Petition Date, Assignor has been operating its business as a Debtor-in-Possession pursuant to Chapter 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code").

4. This Agreement is, in all respects, subject to the approval of the Court, by order ("Order") issued in the Case.

5. Upon approval by Order of the Court, the applicable terms and conditions of this Agreement shall apply to all Accounts purchased by Factor, including (i) Accounts (as defined herein below) purchased by Factor prior to the Petition Date; (ii) Accounts purchased by Factor between the Petition Date and entry of the Order; and (iii) Accounts purchased by Factor following entry of the Order.

In consideration of the above recitals and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**SECTION 1.  DEFINITIONS**

An "Account" means any right to payment for services rendered by or on behalf of Assignor. "Account Debtor" means a person or other entity, which is obligated to pay the Account.

**SECTION 2.  PURCHASE OF ACCOUNTS**

2.1 Assignor agrees to present to Factor for purchase, with recourse, all Accounts arising from the activities and services performed by Assignor.

2.2 Factor, in its sole discretion, may purchase such Accounts from Assignor as Factor determines to be acceptable. Assignor hereby agrees to sell, assign, transfer, convey and deliver to Factor, such Accounts as Factor shall elect to purchase. Assignor will notify each Account Debtor of the sale of its Account or Accounts to Factor and shall place a clear statement or legend, approved by Factor, on each such Account invoice, purchase order, or statement, stating that such Account has been sold and assigned, and is payable to Factor at its office at 9300 Metcalf Ave., Overland Park, Kansas 66212 or at such other address as Factor shall designate in writing. Factor shall become the absolute owner of all Accounts purchased hereunder. All remittances received by Assignor for payment of Accounts sold to Factor are the property of Factor, and Assignor shall hold such proceeds in trust for Factor, and shall immediately deliver to Factor, in the identical form, all payments received by Assignor on each such Account, together with all documents accompanying the remittance to Assignor. Assignor guarantees the timely payment of the monies and amounts represented by the assigned Accounts.

2.3 Neither proceeds from any Account purchased by Factor, nor any other funds may be used to: (i) Pursue (a) any action adverse to interests of the Factor; (b) any action for monetary, injunctive, or other affirmative relief against the Factor; (c) preventing, hindering, delaying the Factor's exercise of any right or remedy; (ii) Object to or challenge the interests held by the Factor; or (iii) Assert, commence or prosecute any claim or cause of action, including Bankruptcy Code chapter 5 claims against the Factor.

**SECTION 3.  PURCHASE PRICE AND FACTORING CHARGE; SECURITY RESERVES**

3.1 The purchase price for each Account purchased by Factor hereunder shall be the net amount of such Account, less the Factor's fee, which fee shall be an amount equal to **1.15%** of such net amount. "Net amount" means the gross amount of the Account less any discount or allowance of any nature allowed to

the Account Debtor. Throughout the term of this Agreement, Factor will review the US Prime Rate ("Prime") in effect as of the first business day of each calendar month and, in the event that the then current Prime changes, the parties hereby agree to a commensurate charge equal to the difference between the effective Prime in effect at the beginning of the month and a base Prime rate of 3.25%. Notwithstanding anything contained herein and to the contrary, Prime will always be the greater of the base Prime rate of 4.75% or the effective Prime at the beginning of the month, whichever is higher.

3.2 Payment of the purchase price to Assignor shall be made as follows:

(a) Initial Payment and Security Reserve. Upon the presentation by Assignor to Factor of documents reasonably acceptable to Factor, including Assignor's invoice to the Account Debtor and/or carrier's invoice to Assignor, for an Account approved for purchase by Factor, and provided no claim or dispute shall then exist with the Account Debtor as to the Account, Factor will advance to the Assignor the purchase price as defined in Section 3.1 or Section 3.1.1 less a security reserve equal to **zero percent (0%)** of the net amount ("Security Reserve").

(b) Final Payment.  Upon Factor's receipt of full payment of the Account invoice from the Account Debtor, and provided Assignor shall not be obligated to repurchase the Account under section 5, or otherwise be in default in any respect under this Agreement, Factor will remit to the Assignor the Security Reserve, and less any applicable deduction for the Factor's fee payable under section 3.1 or 3.1.1, in complete and full payment of the purchase price.

**SECTION 4.  SECURITY INTEREST**

4.1 Assignor hereby grants to Factor as collateral, to secure all of the debts, liabilities and obligations of Assignor to Factor under this Agreement, including all costs and expenses incurred by Factor in connection with the enforcement of its rights under this Agreement, a security interest in the following property of Assignor: all assets, including, but not limited to, (a) all real and personal property, (b) all Accounts, wherever located or situated, and whether now existing or arising in the future, and whether now owned or at any time in the future acquired by Assignor, together with all proceeds and monies due or becoming due on such Accounts; all guaranties, insurance and security for such Accounts; all security reserves related to such Accounts; all of Assignor's rights and interests in the goods giving rise to such Accounts, and the rights associated with or related or pertaining to such goods, including without limitation the right of stoppage in transit and any and all related insurance, any items substituted therefore as replacements and all additions thereto; (c) all of Assignor's chattel paper, instruments, general intangibles, securities, contract rights and insurance associated with or related to the Accounts; (d) all equipment, inventory, and deposit accounts; and (e) all proceeds of any of the foregoing Accounts, property, rights and interests. Factor in its own name, or Factor's collateral agent Motion 120 Trust in its name as the agent of Factor, may file financing statements and all amendments thereto describing as the collateral any or all of the foregoing collateral by any description Factor or its collateral agent deems appropriate in any jurisdiction or office Factor or its collateral agent deems appropriate to perfect Factor's security interest in foregoing collateral.

4.2 In the event of Assignor's breach of any warranty made in this Agreement or the Assignor's failure to observe or perform any of the provisions or obligations of this Agreement, Assignor shall be in default, and Factor may enforce payment and exercise any and all of the rights and remedies provided by Article 9 of the Uniform Commercial Code.  In addition, upon default by Assignor, Factor shall also have the right to take all actions necessary to collect the Accounts directly from the Account Debtors, and Assignor shall obtain in the Order complete and immediate relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code, to permit Factor to take all such actions necessary to collect the Accounts directly from the Account Debtors upon default by Assignor.

4.3 Assignor shall procure by way of entry of an Order by the Court, and pursuant to section 364(c)(1) of the Bankruptcy Code and the terms of this Agreement, the granting to Factor of a superpriority administrative expense claim for all of Assignor's obligations, liabilities and indebtedness under and in connection with the Agreement and all Accounts provided for therein, including principal, interest, attorneys' fees and expenses, financial advisory fees and expenses, and other charges of the Factor (collectively, the "Obligations") and the payment of all Obligations ("Superpriority Claim"), with priority over any or all administrative expenses of the kind specified in section 503(b) and section 507(b) of the Bankruptcy Code. The Superpriority Claim shall be subordinate solely to any unpaid fees and expenses of the United States Trustee and the Clerk of the Court.

4.4  Assignor shall procure by way of entry of an Order by the Court, and pursuant to section 362 of the Bankruptcy Code and the terms of this Agreement, any modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Agreement and any Order by the Court approving the Agreement.

4.5  Assignor acknowledges that all Accounts purchased by Factor prior to the Petition Date, Factor's ownership interests therein, and Assignor's obligations to Factor thereunder, are valid, binding and enforceable, without setoff, deduction, claim, counterclaim or defense of any kind, and that Factor has valid, enforceable and perfected ownership interests in the Accounts.

**SECTION 5.  REPURCHASE OF ACCOUNTS**

All Accounts purchased by Factor from Assignor are purchased with full recourse.  If Assignor breaches any warranty or otherwise violates or defaults on any of its obligations hereunder, or if any Account purchased by Factor hereunder is not paid in full on or before the payment due date of such Account, then upon request by Factor, Assignor shall immediately repurchase such Account from Factor for an amount equal to the face amount of such Account (less any payments received by Factor on such Account from the Account Debtor), together with interest thereon at the rate of **ZERO%** per annum from the date of the assignment of such Account to Factor.  Any security reserve held by Factor for such Account shall be released only in accordance with Section 3.2(b), and Factor shall in all events also be entitled to and shall retain its Factor's fee on the Account.  Typically, Factor will require repurchase of any unpaid Account no later than **90** days after the Account invoice date, unless Factor, in its sole discretion chooses otherwise.  However, in all cases, any unpaid Account must be repurchased by Assignor within **120** days after the Account invoice date.  Assignor shall not be relieved of its absolute repurchase obligation hereunder, even though the Account Debtor, whose Account Assignor must repurchase hereunder, was listed on Factor's debtor credit rating list.

**SECTION 6.  REPRESENTATIONS AND WARRANTIES**

Assignor represents, covenants, warrants and agrees as follows:

6.1  If Assignor is a corporation, that it is a corporation duly organized, existing and in good standing under the laws of the state of **Florida**; that the execution, delivery and performance of this Agreement are in every respect within its corporate powers and have been duly authorized by appropriate corporate action; and that this Agreement, when duly executed and delivered by the Assignor and the Factor, will constitute a legal, valid and binding agreement of the Assignor fully enforceable in accordance with its terms and conditions subject to approval by the Court.

6.2  The Assignor's address set out in Section 14 of this Agreement is the address of Assignor's principal office and its sole place of business.  Assignor shall give Factor immediate written notice of any change in the location of its principal office, the addition of any new place or places of business and their addresses, any name change or the addition of any name under which Assignor does business, or any change in the nature or status of Assignor's business or operations.

6.3  As to each Account purchased by Factor under this Agreement:  (1) the Account is not yet past due, arose in the ordinary course of Assignor's business and represents a bona fide completed transaction; (2) the title of Assignor to the Account is absolute and subject to no assignment, claim, lien or security interest; (3) the Account, as shown on Assignor's books and records and on any invoices, bills of lading or statements, delivered to Factor is a legally enforceable debt owed by Account Debtor to Assignor in its full face amount; (4) no partial payment has been made by anyone on such Account; (5) no set off, credit, allowance, adjustment, counterclaim or defense to such Account exists or will exist and no agreement has been made or will be made with any person or entity under which any deduction or discount may be claimed on such Account; (6) the Account is payable not more than thirty (30) days from the date of assignment of the Account to Factor.

6.4  Assignor shall execute any and all financing statements, Uniform Commercial Code forms or other documents or instruments which Factor deems necessary to protect its interest under this Agreement.

6.5  Assignor shall indemnify, defend and hold Factor harmless from and against any and all misrepresentations or breaches of warranty or other defaults hereunder by Assignor, and from any losses, expenses, attorneys fees or other costs incurred by Factor caused by or arising out of any such defaults or breaches of this Agreement by the Assignor and from any costs expenses or attorneys fees incurred by Factor in enforcing Factor's rights under this Agreement; from any dispute or claim resulting in liability, loss, expense, cost or attorneys fees caused by or arising out of the rejection of any work performed or services rendered by Assignor; or from any alleged claim, dispute, action, defense or set off of every kind and nature asserted by any Account Debtor.

6.6 The Assignor shall not, without the express written consent of the Factor, release, compromise, settle or adjust any Account purchased hereunder, or grant any discounts, allowances or credits thereon.

**SECTION 7.  POWER OF ATTORNEY**

7.1  In order to carry out this Agreement, and to avoid unnecessary notification of Account Debtors, Assignor irrevocably appoints Factor as Assignor's true and lawful attorney with the full power and right to: (a) invoice or bill for, collect, receive, and deposit to Assignor's bank accounts any and all amounts which may be due or become due to Assignor from Account Debtors, and to use Assignor's name for purposes of billing and collection of any and all amounts due; (b) receive, accept, open, dispose of and redirect any and all mail addressed to Assignor;  (c) negotiate any checks received in payment of Accounts whether payable to Assignor or Factor or both, and endorse the name of Assignor on any checks or other evidences of payment or other instruments or documents that may come into the  possession of Factor on Accounts purchased by Factor and on any invoices or other documents or instruments relating to any of the Accounts or relating to any collateral or security hereby granted by Assignor to Factor; (d) in Assignor's name, or otherwise, demand, make claim for. sue for, collect, grant extensions, compromise, discharge, and get or give releases for any and all monies or funds due or to become due on Accounts; (e) execute and deliver receipts or acknowledgments to Account Debtors for such amounts due which shall be binding upon Assignor and Factor; (f) notify Account Debtors of the sale of Accounts to Factor and notify and instruct Account Debtors, in Assignor's name, of the address and procedures for making payments on any Accounts that are sold to Factor or which constitute collateral hereby granted by Assignor to Factor; (g) take all steps necessary to insure payment of such amounts and monies due, and do any and all things in Assignor's name necessary or proper to carry out the purposes intended by this Agreement;  (h) file financing statements and all amendments thereto, describing as collateral any or all of the collateral described in Section 4 hereof by any description Factor deems appropriate in any jurisdiction or office Factor deems appropriate to perfect its security interest in the collateral described in Section 4 hereof; and (i) initiate debit or credit entries through the Federal Reserve Automated Clearing House System (ACH) to any deposit account maintained by Assignor wherever located in order to satisfy any obligations of Assignor to Factor under this Agreement.  It is understood that this power of attorney is coupled with an interest, and is irrevocable until all obligations of Assignor to Factor under this Agreement have been satisfied; or (b) the Court orders otherwise.

7.2 Exercise of the foregoing powers shall be in the sole and absolute discretion of Factor, but Factor shall have no obligation to exercise any of the foregoing powers.  Nothing contained in this Agreement shall in any way require Factor to initiate or become a party to any litigation or other legal proceedings.

7.3  The Factor shall not, under any circumstances, or in any event whatsoever, have any liability for any error, omission or delay of any kind occurring in the collection, payment or settlement of any Account or of any instrument received in full or in part payment thereof or in dealing with any lien, security or guaranty of any such Account

**SECTION 8.  BOOKS, RECORDS AND FINANCIAL STATEMENTS**

8.1  All of Assignor's books, accounts, ledgers, correspondence, records and papers pertaining to all of the Assignor's Accounts and business shall be accurately and properly prepared and maintained by Assignor and shall disclose the sale of Accounts purchased by Factor.  All such books, ledgers, accounts, records, correspondence and papers shall be opened by Assignor at all reasonable times for Factor's inspection, audit and copying.  Upon request, but not more often than weekly, Assignor shall furnish Factor with financial statements including income statements and balance sheets showing Assignor's financial condition.  Upon request, Assignor shall also provide Factor with annual financial statements acceptable to Factor.

8.2  As a material conditions to entering into this Agreement, Assignor agrees to:

a.  Provide Factor with the following weekly reports and information by 5:00 PM EST each Wednesday (reporting for the immediately prior week) via electronic mail to Factor's counsel, beginning one week after any hearing by the Court approving this Agreement (and reporting for the prior week) and continuing for all subsequent applicable weeks, updated accounts receivable reports, including actual invoices generated, cash receipts, and accounts receivable agings, comparing the Assignor's actual weekly invoices generated and cash receipts to the projected weekly invoices generated and cash receipts,  showing a percentage variance for each category; and

b.  Allow Factor and any of its representatives, agents, and/or advisors to conduct periodic field exams of the Assignor and its property during normal business hours and on not less 7-days' notice to the Assignor;

    c. Allow Factor and any of its representatives, agents, and/or advisors to continue to issue periodic account receivable verifications to Assignor's vendors, suppliers, customers, and independent contractors; and

    d. Allow Factor and any of its representatives, agents, advisors, and/or advisors, including appraisers, reasonable access to the Assignor and its property for purposes of conducting any appraisals or inspections during normal business hours and on not less than 7-days' notice to the Assignor.

**SECTION 9.  ATTORNEY'S FEES AND EXPENSES**

If Factor retains the services of an attorney to enforce any obligation of Assignor to Factor under this Agreement, Factor shall be entitled to recover from Assignor all attorneys fees, court costs and expenses, regardless of whether or not an action is commenced.  In addition, Assignor hereby agrees to reimburse Factor for all reasonable attorneys' fees, court costs and expenses incurred by Factor associated with Assignor's Case, including without limitation the negotiation of this Agreement, the procurement of interim and final Orders by the Court approving of this Agreement, and/or any required enforcement of this Agreement.

**SECTION 10.  GOVERNING LAW AND CONSENT TO JURISDICTION**

10.1 This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas.

10.2 Factor and Assignor agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in the Court.  Factor and Assignor submit to the jurisdiction of the Court for purpose of deciding any questions, disputes or causes, arising under this Agreement.

**SECTION 11.  TERMINATION**

11.1 This Agreement shall have an initial term of twelve (12) months from the Effective Date hereof (the "Original Term"), and shall automatically renew for successive periods of twelve (12) months ("Renewal Periods"), unless sooner terminated as hereinafter provided. Assignor may terminate this Agreement as of the expiration of the Original Term or any Renewal Term by giving Factor prior written notice of its intention to so terminate; provided, however, that any presentation of Accounts by Assignor to Factor for funding after the termination date shall cancel any prior termination notice and renew this Agreement for another Renewal Period. Such notice shall be given by Assignor to Factor at least sixty (60) days, but not more than ninety (90) days, prior to the expiration of the Original Term or any Renewal Term. Factor may terminate this Agreement at any time upon thirty (30) days prior written notice to Assignor; provided however, that this Agreement shall terminate immediately, at the option of Factor, upon any default or breach of this Agreement by Assignor.

11.2 All of the Assignor's covenants, warranties and agreements under this Agreement made to Factor, and all rights and remedies of the Factor under this Agreement, shall survive the termination of this Agreement and shall continue in full force and effect until all Accounts purchased hereunder are paid in full and all debts and obligations to of Assignor to Factor hereunder have been satisfied in full. Upon termination Assignor shall remain liable to Factor for any and all unpaid Accounts, and for all other amounts and monies as may be owed to Factor under the terms and conditions of this Agreement. Upon termination, any security reserve and any other funds or monies from any source whatsoever which would otherwise be owing to Assignor by Factor may be retained by Factor until such time as all obligations and debts of Assignor to Factor have been fully satisfied, and Factor's security interest provided in Section 4 hereof shall continue until all obligations of Assignor to Factor are paid in full. Factor shall have the right, in its sole discretion, to set off against the security reserve and any other sums owing to Assignor by Factor all obligations and debts of Assignor to Factor, and Assignor shall obtain, on behalf of Factor, in any Order complete and immediate relief from the automatic stay pursuant to section 362 of the Bankruptcy Code to set off against the security reserve and any other sums owing to Assignor by Factor all obligations and debts of Assignor to Factor.

11.3 Factor's obligations under this Agreement shall terminate upon any event of default set forth elsewhere in this Agreement, as well as upon any of the following events of default:

    a. Failure by Assignor to comply with the terms of this Agreement and any Court Order approving this Agreement;

 b. Assignor's failure to use Account proceeds in manner consistent with the terms and conditions of this Agreement, a Court order approving this Agreement, and in accordance with the Budget (attached to any Assignor motion seeking Court approval of this Agreement), solely for the purposes set forth in the Budget;

 c. Assignor's use of Account proceeds to pursue (i) any action adverse to interests of the Factor; (ii) any action for monetary, injunctive, or other affirmative relief against the Factor; (iii) preventing, hindering, delaying the Factor's exercise of any right or remedy; (iv) object to or challenge the interests held by the Factor; or (v) assert, commence or prosecute any claim or cause of action, including chapter 5 claims against the Factor.

 d. The obtaining of credit or the incurrence of indebtedness that is equal to or senior to the claims of the Factor, or entitled to priority administrative status which is equal or senior to that granted to the Factor herein;

 e. The reversal, vacatur, or modification (without the express prior written consent of the Factor, in its sole discretion) of any Court Order approving the Agreement;

 f. Dismissal or conversion of the Assignor's chapter 11 Case, or appointment of a chapter 11 trustee or examiner;

 g. The sale of any portion of the Assignor's assets outside the ordinary course of business without the prior written consent of the Factor, in its sole discretion;

 h. Assignor's failure to obtain entry of a Final Order by the Court within sixty (60) days of approval of this Agreement; and

 i. Assignor's assertion in any pleading filed in any court that (i) any material provision of any interim or final Order approving this Agreement is not valid and binding for any reason; (ii) any material provision of any interim or final Order approving this Agreement shall, for any reason, cease to be valid and binding without the prior written consent of the Factor.

**SECTION 12.  MODIFICATION, SEVERABILITY, SUCCESSORS AND ASSIGNS, ETC.**

 This Agreement may be modified only by written instrument signed by the parties hereto.  In the event that any one or more of the provisions contained in this Agreement should be held by any court of competent jurisdiction to be unenforceable, the holding or decision shall not affect or impair any of the other provisions of this Agreement.  This Agreement supersedes all prior agreements between the parties, and shall bind the successors and assigns of Assignor and shall inure to the benefit of the successors and assigns of Factor.  As used in this Agreement, the singular shall be deemed to include the plural and vice versa, and the neuter shall be deemed to include the masculine or feminine, and vice versa.

**SECTION 13.  NO DELAY**

 13.1 No delay or omission on the part of Factor in enforcing or exercising any right hereunder shall operate as a waiver of such right or any other right.  The waiver by Factor of the breach by Assignor of any provision of this Agreement, or of Assignor's compliance with such provisions, shall not be construed as a waiver of any other breach or of the provision itself.  No waiver or modification of the Agreement shall be chargeable against Factor unless in writing, signed by Factor and delivered by Factor to Assignor.

 13.2 The waiver, compromise, discharge, extension or release by Factor, of any duty or obligation of any Account Debtor shall not reduce, diminish, limit, or restrict in any way Assignor's obligations and liabilities to Factor.

**SECTION 14.  NOTICE**

 Notices under this Agreement shall be in writing and mailed postage prepaid, registered or certified mail, return receipt requested, or sent by overnight delivery service, addressed to the addressees set forth below, or to such other address as either party notifies the other in writing.  All such notices shall be effective upon receipt if delivered by hand or overnight delivery service; otherwise upon three (3) business days after the notice is placed in the U.S. Mail.  Addresses for notices are as follows:

| In the case of Assignor, to: | In the case of Factor, to: |
|---|---|
| **DM WORLD TRANSPORTATION LLC**<br>**450 S RONALD REAGAN BLVD**<br>**LONGWOOD, FL 32750**<br>**TEL:  407-802-4146** | **RTS FINANCIAL SERVICE, INC.**<br>**9300 METCALF AVE**<br>**OVERLAND PARK, KS 66212**<br>**TEL:  800-860-7926** |

**SECTION 15.  COUNTERPARTS; FACSIMILE SIGNATURES**

      This Agreement may be executed in one or more counterparts and by different signatories thereto, all of which counterparts, when taken together, shall constitute but one agreement.  This Agreement may be validly executed and delivered by facsimile or other electronic transmission and any such execution or delivery shall be fully effective as if executed and delivered in person.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, as of **MAY 11, 2020**.

                                            ASSIGNOR:
                                            **DM WORLD TRANSPORTATION LLC**
                                            **As Debtor-in-Possession**
                                            **MC# 770942**

By: _____

DILSHOD MIKHMANOV
Title:   MEMBER/MANAGER


                                            FACTOR:
                                            **RTS FINANCIAL SERVICE, INC.**


By: _____

Title:     VICE-PRESIDENT

# **GUARANTY**

For valuable consideration and to induce **RTS FINANCIAL SERVICE, INC. ("RTS")** to enter into the Factoring Agreement dated **May 11, 2020** ("the Factoring Agreement") with **DM WORLD TRANSPORTATION LLC ("ASSIGNOR"),** I the undersigned, do hereby guarantee to **RTS**, its successors and assigns the full, prompt and complete performance by **ASSIGNOR** of all of the provisions, conditions, covenants and agreements contained in the Factoring Agreement, including the full and complete payment of all monies that become due thereunder to **RTS** by **ASSIGNOR** under the Factoring Agreement and any related guarantees associated with the Factoring Agreement and do hereby waive all notice of default by **ASSIGNOR** and notice of acceptance of this guaranty by **RTS**, and do hereby consent to any extension of time that may be given by **RTS** to **ASSIGNOR** of time of payment or performance. This guaranty is not limited to any particular period of time, but shall continue until all of the terms, covenants, and conditions of the Factoring Agreement and related guarantees have been fully and completely performed by **ASSIGNOR** and the undersigned shall not be released of any obligation or liability hereunder so long as there is any claim of **RTS** against **ASSIGNOR** arising out of the Factoring Agreement, or any third parties under any guarantees associated with the Factoring Agreement, that has not been settled or discharged in full. The undersigned waives any right to require **RTS** to proceed against **ASSIGNOR**, the account debtors or customers of **ASSIGNOR** or any other person, or to proceed against or exhaust any security or pursue any other remedy in **RTS'** power. Whether or not suit be initiated, the undersigned agrees to pay reasonable attorneys' fees and all other costs and expenses incurred by **RTS** in enforcing this guaranty and in any actions or proceedings arising out of or relating to the guaranty. To secure the undersigned's obligations to **RTS** under this Guaranty and to the extent permitted by applicable law, **RTS** reserves a right of setoff in any factoring accounts held by **RTS** relating to the undersigned. The factoring accounts are referenced in the Factoring Agreement(s), as amended, between the undersigned and **RTS**. This includes all accounts the undersigned currently holds and all accounts the undersigned may assign to **RTS** in the future. The undersigned authorizes **RTS** to charge or setoff all sums owing on the debt of this Guaranty against any and all such accounts, against any advances otherwise due to the undersigned on accounts purchased by **RTS** and against any funds held in the security reserve for the undersigned with respect to such accounts. The undersigned hereby grants to **RTS** a continuing security interest in all of the undersigned's assets, including, but not limited to, all equipment, inventory, all real and personal property, existing and hereafter arising accounts, accounts receivable and deposit accounts, and all proceeds thereof (the "Collateral"). **RTS** is hereby authorized to file all UCC financing statements and other documents which **RTS** deems necessary or appropriate to perfect its security interest in the Collateral. To the extent **ASSIGNOR** guarantees the obligations of a third party that results in a negative balance due by **ASSIGNOR** to **RTS** under the Factoring Agreement between **RTS** and **ASSIGNOR**, I hereby understand and agree that this guaranty shall also apply to those third party obligations and I shall be personally liable for the obligations of such third party under this guaranty to the extent **ASSIGNOR** is obligated to **RTS** under the respective Factoring Agreement and related guaranty. This guaranty shall be governed and construed in accordance with the laws of the state of Kansas. The undersigned hereby consents to the sole and exclusive jurisdiction of any state or Federal court within the state of Kansas in connection with the enforcement of this guaranty.

_____

DILSHOD MIKHMANOV
14112 DOVE HOLLOW DR
ORLANDO, FL 32824

# CERTIFIED COPY OF RESOLUTIONS
(LLC)

"**RESOLVED**, that the Factoring Agreement dated **May 11, 2020** between **DM WORLD TRANSPORTATION LLC (**"this company") and **RTS FINANCIAL SERVICE, INC. ("RTS")** and all other agreements and documents connected therewith be, and the same hereby are, approved on the terms and conditions as set forth therein";

"**RESOLVED**, that any officer, manager or member of this company be, and he hereby is authorized and directed to enter into said agreement and all other agreements and documents connected therewith and to execute the same for and on behalf of this company on the terms and conditions set forth therein";

"**RESOLVED**, that any officer, manager or member of this company be, and hereby is authorized and directed to negotiate, agree upon, execute and deliver, from time to time, in the name of, and on behalf of, this company, such agreements, amendments, and supplements to said agreement or any other agreement or document connected therewith, documents, instruments, certificates, notices and further assurances and to perform any and all such acts and things as may be required by **RTS** in connection with said agreement or any other agreement or document connected therewith, or may to him seem necessary or proper to implement and effect complete consummation of said agreement or any other agreement or document connected therewith in all respects and the purposes set forth in these resolutions";

"**RESOLVED,** that these resolutions shall remain in full force and effect until all indebtedness and obligations arising out of said agreement and all other agreements and documents connected therewith shall have been paid and satisfied in full."

The undersigned, being all of the Members and Managers of **DM WORLD TRANSPORTATION LLC** do hereby certify that the foregoing is a true and correct copy of the resolutions duly adopted at a meeting of the Members and Managers of **DM WORLD TRANSPORTATION LLC**, a **Florida** limited liability company, duly called, noticed and held on **JANUARY 28, 2020**, at which meeting there were at all times present and acting Members and Managers of the company; and that said resolutions are in full force and effect; and that the following is a true and correct list of all of the Members and Managers of **DM WORLD TRANSPORTATION LLC**.

_____
DILSHOD MIKHMANOV, Member / Manager


Date: _____

==Future Expenses==

|  |  |  |  | Exhibit "B" |  |  |  |  |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DM World Transportation LLC |  |  |  |  |  |  |  |  |
|  | 8-May-20 | 15-May-20 | 22-May-20 | 29-May-20 | 5-Jun-20 | 12-Jun-20 | 19-Jun-20 | 26-Jun-20 |
| **Accounts Receivable** |  |  |  |  |  |  |  |  |
| Beginning Balance | $ 4,190,478.19 | $ 4,403,306.34 | $ 4,619,306.15 | $ 4,826,907.55 | $ 5,058,166.37 | $ 5,289,956.66 | $ 5,507,264.83 | $ 5,711,073.00 |
| Invoices Generated | $ 212,828.15 | $ 215,999.81 | $ 207,601.40 | $ 231,258.82 | $ 231,790.29 | $ 217,308.17 | $ 203,808.17 | $ 215,307.69 |
| **Ending Balance** | $ 4,403,306.34 | $ 4,619,306.15 | $ 4,826,907.55 | $ 5,058,166.37 | $ 5,289,956.66 | $ 5,507,264.83 | $ 5,711,073.00 | $ 5,926,380.69 |
|  |  |  |  |  |  |  |  |  |
| **Cash Activity** |  |  |  |  |  |  |  |  |
| Beginning Balance | $ 7,132.70 | $ 3,595.02 | $ 6,005.78 | $ 8,687.22 | $ 3,595.02 | $ 24,317.48 | $ 718.46 | $ 2,684.11 |
|  | $ (3,537.68) | $ 2,410.76 | $ 2,681.44 | $ (5,092.20) | $ 20,722.46 | $ (23,599.02) | $ 1,965.65 | $ 853.57 |
| **Total Deposits** | $ 3,595.02 | $ 6,005.78 | $ 8,687.22 | $ 3,595.02 | $ 24,317.48 | $ 718.46 | $ 2,684.11 | $ 3,537.68 |

|  | 8-May-20 | 15-May-20 | 22-May-20 | 29-May-20 | 5-Jun-20 | 12-Jun-20 | 19-Jun-20 | 26-Jun-20 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Less Withdrawls: |  |  |  |  |  |  |  |  |
| Operating |  |  |  |  |  |  |  |  |
| Bank Service Charges | $ - | $ 3,500.00 | $ - | $ - | $ - | $ 3,500.00 |  | $ - |
| County Taxes | $ - | $ 38,637.35 | $ 20,629.15 | $ - | $ - | $ - | $ - | $ - |
| Dues and Subscrptions | $ 846.00 | $ 1,500.00 | $ 75.00 | $ 60.00 | $ - | $ 250.00 | $ 35.00 | $ 50.00 |
| Garbage & Disposal | $ - | $ - | $ - | $ 165.00 | $ - | $ - | $ - | $ 165.00 |
| Driver Payroll (SubContractor) | $ 42,891.27 | $ 42,891.27 | $ 42,891.27 | $ 42,891.27 | $ 42,891.27 | $ 42,891.27 | $ 42,891.27 | $ 42,891.27 |
| Insurance Expense | $ 39,878.29 | $ 5,000.00 | $ 5,787.86 | $ 4,455.00 | $ 39,878.29 | $ 5,000.00 | $ 5,787.86 | $ 4,455.00 |
| Interest Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Internet Expense | $ - | $ 521.27 | $ - | $ - | $ - | $ 521.27 | $ - | $ - |
| Late Fees | $ 6,550.00 | $ 6,750.00 | $ 6,870.00 | $ 6,950.00 | $ 7,050.00 | $ 7,150.00 | $ 7,260.00 | $ 7,350.00 |
| Miscellaneous Expense | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Office Supplies | $ 250.00 | $ - | $ 190.00 | $ - | $ 245.00 | $ - | $ 225.00 | $ - |
| Parking and Tolls | $ 2,465.00 | $ 2,350.00 | $ 2,560.00 | $ 2,445.00 | $ 2,660.00 | $ 2,600.00 | $ 2,570.00 | $ 2,605.00 |
| Pest, Lawn, Maintan | $ 58.85 | $ 275.00 | $ 500.00 | $ - | $ 58.85 | $ 275.00 | $ 500.00 | $ - |
| Postage and Delivery Expense | $ 375.00 | $ 345.00 | $ 250.00 | $ 275.00 | $ 305.00 | $ 265.00 | $ 255.00 | $ 246.00 |
| Processing Fee |  |  |  |  |  |  |  |  |
| Professional Fees | $ 2,500.00 | $ 1,500.00 |  |  | $ 2,500.00 | $ 1,500.00 | $ - |  |
| Payroll Exprenses | $ 17,703.45 | $ 17,703.45 | $ 17,703.45 | $ 17,703.45 | $ 17,703.45 | $ 17,703.45 | $ 17,703.45 | $ 17,703.45 |
| Past Due Payroll | $ 38,525.56 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Recruting | $ 1,300.00 | $ 750.00 | $ 1,448.00 | $ - | $ 1,250.00 | $ 740.00 | $ 1,448.00 | $ - |
|  Rent Expense | $ 23,098.79 | $ - | $ - | $ - | $ 23,098.79 | $ - | $ - | $ - |
| Other COS/SG&A | $ 30,840.00 | $ 31,500.00 | $ 32,580.00 | $ 33,870.00 | $ 32,000.00 | $ 35,950.00 | $ 34,880.00 | $ 36,540.00 |
| RedRock Truck Rental | $ 15,172.24 | $ - | $ - | $ - | $ 15,172.24 | $ - | $ - | $ - |
|  Truck Repair and Maintan | $ 3,750.00 | $ 4,200.00 | $ 3,950.00 | $ 4,100.00 | $ 3,870.00 | $ 4,265.00 | $ 4,050.00 | $ 3,555.00 |
| Software | $ 9,850.00 |  | $ 560.00 | $ - | $ 9,850.00 |  | $ 560.00 | $ - |
| Highway Taxes | $ 5,600.00 |  |  |  |  |  |  |  |
| Telephone/Wireless Expense | $ 5,600.00 | $ 719.52 | $ - | $ - | $ 5,600.00 | $ 719.52 | $ - | $ - |
| Utilities |  | $ 270.98 | $ 1,450.00 | $ - | $ - | $ 270.98 | $ 1,550.00 | $ - |
| Violation | $ 125.00 | $ 50.00 | $ 85.00 | $ 95.00 | $ 105.00 | $ 150.00 | $ 250.00 | $ 205.00 |
| **Total Operating Activities** | $ 247,379.45 | $ 158,463.84 | $ 137,529.73 | $ 113,009.72 | $ 204,237.89 | $ 123,751.49 | $ 119,965.58 | $ 115,765.72 |